BOLIN, Justice
(concurring specially).
“Adoption statutes are intended to benefit children in need of a home and parental care by providing for creation of a status substantially equivalent to that of parent and child.
[[Image here]]
“In order to fulfill their duty to children within their respective borders, especially those in need of homes, and promote the general welfare of children, states have enacted statutes designed to regulate the creation of the closest conceivable counterpart of the relationship of parent and child, and to place a minor child adopted into a family on the same basis as a child born into the family, while, at the same time, protecting the rights of the children, and whenever possible, the rights of the natural and adoptive parents. The primary purpose of an adoption statute is to promote the welfare or best interests of the children, which include the encouragement of adoption in general and an expeditious and positive adoption specifically.”
2 C.J.S. Adoption of Persons § 4 (2003)(footnotes omitted; emphasis added).
I concur in the main opinion. I write specially to lament that cases such as this one languish far too long in multijurisdic-tional adoption disputes and therefore completely fail to fulfill the above-stated purposes and principles of the adoption process. Anyone who has witnessed the end product of the nationally publicized cases of Baby Jessica[6] and Baby Richard,[7] two infant adoptions litigated for years *957 before it was determined that the custody of both infants should be given to the biological father, would be heartless and lacking human emotion if he or she did not recoil at the sight of these children being pulled away from the only loving adults they had ever known and restored to, essentially, a stranger. In regard to the stability every child needs and deserves, it has been stated:
“Every child has an interest in a safe and permanent home environment because stability is essential to a child’s physical, mental and emotional development. As one commentator noted:
“‘Children are not static objects. They grow and develop, and their proper growth and development require more than day-to-day satisfaction of their physical needs. Their growth and development also require day-to-day satisfaction of their emotional needs, and a primary emotional need is for permanence and stability. Only when their emotional needs are satisfied can children develop the emotional attachments that have independent constitutional significance. A child’s need for permanence and stability, like his or her other needs, cannot be postponed. It must be provided early.’
“Furthermore, once the child and adoptive parents have developed a stable home environment, removal from that environment may be physically, emotionally and psychologically detrimental to the child’s development....”
Kimberly Barton, Who’s Your Daddy?: State Adoption Statutes and the Unknown Biological Father, 32 Cap. U.L.Rev. 113, 143 (2003) (footnotes omitted).
The adoption of a child by loving adoptive parents is as beautiful a process as the birth of a child to biological parents. The adoption of a child creates a new family unit, which is just as sacred as that created when a child is born to biological parents. In either case, the bonding process between parent and child is an almost instantaneous process. As a former probate judge, I can state from experience that adoptive couples love and view their child no differently than biological parents do theirs. The family relationship created by an adoption is just as strong for the adoptee. Any newborn adoptee, just as in the case of the child here, has no choice or voice in the matter of where he or she lives, or with whom. Each day, the newborn adoptee grows with and loves, and is nurtured by and depends upon, the only mother and father the newborn has ever known. The infant adoptee knows not whether this mother or father cares for him by birthright or by court order. For society to allow litigation to continue for years while this relationship is being fostered before judicially deciding that this relationship is improper is unfathomable, unmerciful, and unconscionable.
I note that “[m]ost adoptions of children born out of wedlock are consensual rather than contested; they take place with the valid consents for the termination of parental rights of the biological parents.” Janet Ann Briseno, Idaho’s Putative Father Registry Statute: Is There Really an Opportunity Interest for Putative Fathers?, 33 Idaho L.Rev. 415, 416 (1997) (footnotes omitted). Protecting the rights of each party to an adoption inures to the benefit of all concerned and allows for what should be the stated goal in any adoption proceeding — a final judgment of adoption that puts to rest all issues and provides a stable, permanent, and continuing home life for the adoptee. Typically, the adoption of children born to unwed parents is initiated by the biological mother; her consent, therefore, is generally not an issue. When disputes arise, the over *958 whelming majority of cases result when the putative father does not receive notice of the adoption proceeding and does not give his consent, either express or implied, to the adoption. There is no perfect world, and there is no ironclad method that will guarantee that there would never be disputes in adoption proceedings. Although this is not a perfect world and there are no guarantees, there is available a procedural device that can provide notice to putative fathers, no matter where that notice is filed, so that if there is an obstacle to the adoption, this obstacle can be discovered and addressed early on, rather than litigating the issue for years and setting up the potential removal of three- and four-year-old children from the only home and parents they have ever known. This procedural device would be a national putative-father registry. It is a procedural device that adoption specialists and adoption attorneys have been calling for for years. Cecily Helms, Phyllis Spence, Take Notice Unwed Fathers: An Unwed Mother’s Right to Privacy in Adoption Proceedings, 20 Wisc. Women’s L.J. 1 (2005); Donna L. Moore, Implementing a National Putative Father Registry by Utilizing Existing Federal/State Collaborative Databases, 36 J. Marshall L.Rev. 1033 (2003); Mary Beck, Toward a National Putative Father Registry Database, 25 Harv. J.L. & Pub. Pol’y 1031 (2002). Although family issues should normally be reserved to the individual states for resolution, this is one issue that can be solved only by federal legislation, and I hereby humbly request, indeed implore, the United States Congress to enact such legislation to provide putative fathers with notice of the pen-dency of adoption proceedings.
A putative father is “[t]he alleged biological father of a child born out of wedlock.” Black’s Law Dictionary 641 (8th ed.2004). A putative-father registry is “[a]n official roster in which an unwed father may claim possible paternity of a child for purposes of receiving notice of a prospective adoption of the child.” Black’s Law Dictionary 1272. Before 1972, when the United States Supreme Court decided Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), state courts handling adoption proceedings gave very little thought to notifying putative fathers of the adoption proceeding. Adoptions were unknown at common law, and the common law did not provide for the protection of any rights, including custodial rights, of an unwed biological father. An historical perspective is helpful in understanding how we arrived at our present dilemma. Kimberly Barton, writing for the Capital University Law Review, has, as succinctly as possible, set out the historical trail of putative fathers’ rights, including a discussion of the four seminal United States Supreme Court cases on the subject: Stanley, supra, Quilloin v. Walcott, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978), Caban v. Mohammed, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979), and Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). Ms. Barton summarized as follows:
“To fully understand the rights and interests of unknown biological fathers under current law, it is important to examine both the historical treatment of unwed fathers under statutory and common law, and the Supreme Court cases that have addressed the rights and interests of unwed fathers under the Due Process and Equal Protection Clauses of the United States Constitution.
“A. Historical Treatment of Unwed Fathers
“Prior to 1972, the custodial rights of unwed fathers were not legally protected by common law or statute. The ancient rule at common law governing the custody of illegitimate children came *959 within the doctrine of films populi, or ‘son of the people.’ This doctrine provided that the custody of an illegitimate child was in the hands of the parish. As such, neither unwed mothers nor unwed fathers had custodial rights under the early common law.
“The common law rule regarding the custody of illegitimate children was eventually modified to award exclusive custody to the mother, thereby excluding only the putative father. This modification ‘arose from the presumption that [unwed mothers] were better custodian[s] than the putative fathers.’ Numerous factors gave rise to this presumption, including ‘the ease with which the mother could be identified and located, the obligation normally placed by society on the mother to care for and raise her children, and the strength of the bonds of love and affection assumed to exist between mother and child.’
“The common law rule did not contemplate the possibility that unwed ‘father[s] might seek to assert paternity rather than escape it.’ Instead, it presumed that ‘unwed fathers whose identities were often uncertain, were “irresponsible and unconcerned about their children,” and thus not entitled to any relationship with them.’
“Since adoption was unknown at common law, a putative father’s rights with respect to the adoption of his child were defined by state statutes. State legislatures provided the general rule that the consent of the unwed mother was enough for legal relinquishment of the child. In fact, states statutorily defined ‘parent’ to include both the mother and father of legitimate children, but only the mother of illegitimate children. States even went so far as to say that a putative father who married the mother of his illegitimate child while adoption proceedings for the child were pending did not acquire the right to consent to the child’s adoption. Thus, an unwed father was essentially powerless to prevent his illegitimate child from being placed for adoption if that was the natural mother’s wish.
“There were a number of purposes of these early adoption statutes. Lawmakers believed these statutes promoted the adoption of illegitimate children, protected the privacy of unwed mothers, and provided adoptive parents with unassailable rights to their adopted children. It has also been suggested that these early statutes ‘sought to punish putative fathers for their sins in order to deter promiscuity and illegitimacy, while encouraging marriage and promoting legitimate family units.’ In 1972, however, the prevailing view toward unwed fathers was forever changed.
“B. United States Supreme Court Decisions
“In 1972, the United States Supreme Court decided the first of four cases that have had a significant impact on the extent to which a natural father’s biological relationship with his illegitimate child receives constitutional protection.
“1. Stanley v. Illinois (1972)
“In this case, Peter and Joan Stanley had lived together for eighteen years in a non-marital relationship, during which time they had three children. When Joan died, the State of Illinois instituted a dependency hearing in conjunction with a state law that declared illegitimate children wards of the State upon the death of the mother. Because the State did not recognize an unwed father as a ‘parent,’ the children were presumed to be without parents and became wards of the State.
“Stanley appealed, claiming that he had never been shown to be an unfit *960 parent. ‘Since married fathers and unwed mothers could not be deprived of their children without such a showing, [he argued] that he had been deprived’ of his Fourteenth Amendment right of equal protection.
“The State contended that its interests in protecting the ‘ “moral, emotional, mental and physical welfare of the minor” ’ and ‘ “strengthening] the minor’s family ties whenever possible” ’ justified the procedure on the grounds that, as a general rule, unwed fathers were not fit parents. Thus, the State argued that it was not required to give unwed fathers any special treatment with respect to the custody of their children.
“Rejecting the State’s contention, the Supreme Court ruled that unwed fathers have a significant private interest in their continued relationship with children they have ‘sired and raised’ that ‘undeniably warrants deference and, absent a powerful countervailing interest, protection.’ Although the Court acknowledged that the State’s interests were legitimate, it found that the State’s goals of protecting minors and strengthening familial bonds were not furthered by separating children from the custody of fit parents. Therefore, the Court held that the State was barred, as a matter of both due process and equal protection, from taking custody of an unwed father’s children, absent a hearing and a particularized finding that the father was an unfit parent.
“2. Quilloin v. Walcott (1978)
“In this case, Randall Walcott, the stepfather of an illegitimate child, sought to adopt his stepson. At the time of the adoption hearing, the child was eleven years old. The child had lived continuously with his stepfather for eight years and expressed a desire to be adopted by him. On the other hand, Leon Quilloin, the child’s biological father, had never sought custody of him, had not sought to legitimize him, and ‘provided [financial] support only on an irregular basis.’ Although the child had visited with him numerous times, the mother had concluded that the visits ‘were having a disruptive effect on the child and [the child’s] entire family.’
“Under the relevant state statute, a biological father who had not legitimized his child, either by marrying the mother and acknowledging the child as his own, or by obtaining a court order declaring the child legitimate, was given no veto power over the adoption. His only recourse was to appear at the adoption hearing in an attempt to establish that the adoption was not in the child’s best interest.
“After its hearing on the best interests of the child, and without specifically finding that Quilloin was unfit, the trial court granted Walcott’s adoption petition, thereby terminating Quilloin’s parental rights. Quilloin appealed, arguing that due process required that there be a finding of abandonment or other unfitness before his parental rights could be terminated. He also claimed an equal protection violation because the State did not require a finding of unfitness before terminating the rights of previously-married fathers.
“In its analysis of his due process claim, the Supreme Court noted that Quilloin had been afforded adequate notice and an opportunity to be heard pri- or to the adoption decree. Therefore, it defined the underlying issue as “whether, in the circumstances of this case and in light of the authority granted by Georgia law to married fathers, [Quil-loin’s] interests were adequately protect *961 ed by a “best interests of the child” standard.’
“The Court focused its analysis on the relationship that had been established between Quilloin and his son. It emphasized that this was not a case in which the unwed father at any time had, or sought to have, actual or legal custody of his child, nor was it a case in which the proposed adoption would place the child in the custody of unfamiliar adoptive parents. Rather, the resulting adoption would give full legal recognition to an existing family unit. Therefore, the Court held that the State was not required by due process to find anything more than that the adoption was in the best interests of the child.
“In its analysis of his equal protection claim, the Court found that the interests •of fathers like Quilloin differed from those of separated or divorced fathers. Unlike a married father who is separated or divorced from the mother and is no longer living with his child, Quilloin had ‘never exercised actual or legal custody over his child, and thus, ha[d] never shouldered any significant responsibility with respect to the daily supervision, education, protection, or care of the child.’ Therefore, the Court held that Quilloin’s guarantee of equal protection of the laws had not been violated.
“This case is significant because it was the first time the Court suggested that ‘a biological connection alone is insufficient to obtain full, constitutionally protected, parental rights.’ In subsequent cases, the Court confirmed this principle.
“3. Caban v. Mohammed (1979)
“In this case, Abdiel Caban and Maria Mohammed had lived together in a non-marital relationship for five years, during which time they had two children. Caban identified himself as the father on both birth certificates, and he contributed to the children’s support. After the couple separated, Mohammed took the children and married another man. Ca-ban continued to see the children once a week until their maternal grandmother took them to Puerto Rico. One year later, he went to Puerto Rico to visit the children. The grandmother ‘willingly surrendered the children to [him]’ with the understanding that he would return them in a few days. Caban, however, returned to New York with the children. When Mohammed learned that the children were in his custody, she instituted proceedings in state court and was granted temporary custody. Caban and his new wife were given visitation rights.
“Two months later, Mohammed and her new husband petitioned for adoption of the children. Caban and his wife filed a cross-petition for adoption. Under the relevant state statute, only the mother’s consent was necessary for the adoption of an illegitimate child. Pursuant to this law, an unwed mother could block the father’s petition by simply withholding consent, but the unwed father could prevent termination of his parental rights only by showing that the best interests of the child would not be furthered by permitting the petitioning couple to adopt the child.
“The lower court granted Mohammed’s adoption petition, thereby extinguishing Caban’s parental rights and obligations. After the appellate court affirmed, Caban petitioned the United States Supreme Court to review the decision. On appeal, Caban argued that the relevant state statute drew a distinction between unwed fathers and other parents, thus violating his equal protection rights. He also claimed, that the *962 Court’s decision in Quüloin established that a natural father has a due process right to maintain a parental relationship with his child unless a court concludes that he is an unfit parent.
“Despite these two claims, the Supreme Court defined the pivotal issue as “whether the distinction in [the relevant state statute] between unmarried mothers and unmarried fathers bears a substantial relation to some important state interest.’ After acknowledging the State’s interests in providing for the well-being of illegitimate children, the Court found that the statutory distinction between unwed fathers and unwed mothers was not substantially related to that interest. The Court concluded that the State’s distinction between unwed mothers and unwed fathers ‘illustrate^] the harshness of classifying unwed fathers as being invariably less qualified and entitled than mothers to exercise a concerned judgment as to the fate of their children.’
“The Court appeared to limit its holding to cases involving older children who had a developed relationship with their fathers because in such situations the parental roles of mothers and fathers are not invariably different in importance. However, the Court distinguished this scenario from that of cases in which an unwed father has not come forward to establish a parental interest in his child and stated that ‘nothing in the Equal Protection Clause precludes the State from withholding from him the privilege of vetoing the adoption of that child.’
“Four years later, the Court addressed a more difficult case concerning an unwed father who had not been given the opportunity to form a relationship with his young child.
“4. Lehr v. Robertson (1983)
“In this case, Jonathan Lehr lived with Lorraine Robertson in a non-marital relationship, during which they had a daughter. Eight months after the young girl’s birth, Robertson married another man, and the couple filed an adoption petition in state court two years later. Because Lehr did not fall into any of the categories of putative fathers who were required by the State to receive notice of adoption proceedings, he was not notified of the petition. Approximately one month later, still unaware of the Robertsons’ adoption petition, Lehr filed a petition in a different county court, asking for ‘a determination of paternity, an order of support, and reasonable visitation privileges.’
“Lehr first learned of the adoption proceeding when he received notice of a change of venue motion that had been filed by the Robertsons in his paternity action. He planned to seek a stay of the adoption proceeding pending the determination of the paternity petition, but when his attorney called the judge to inform him of Lehr’s intention, the judge advised the attorney that the adoption order had been signed earlier that day.
“Lehr filed a petition to vacate the order of adoption, claiming it had been ‘obtained by fraud and in violation of his constitutional rights.’ The trial court denied his petition and held that the ‘commencement of a paternity action did not give him any right to receive notice of the adoption proceeding.’ Both the appellate court and the State’s highest court affirmed, parenthetically noting that Lehr could have insured his right to notice by registering with the State’s putative father registry.
“Lehr appealed the decision to the U.S. Supreme Court, claiming that due process required that an unwed father *963 receive notice and an opportunity to be heard before his actual or potential relationship with his child born out of wedlock could be terminated. He also argued that the statute’s gender-based classification violated his equal protection rights because it denied him the right to consent to his daughter’s adoption and afforded him fewer procedural rights than her mother.
“The Court began its analysis by focusing on the nature of the private interest involved. After identifying the individual interest as being that of the parent-child relationship, the Court discussed the two types of relationships that exist between putative fathers and their children. The first type is the solely biological relationship present in Quilloin, which the Court characterized as inchoate because it consists merely of the potential to develop into a full relationship. The second type, by contrast, is the developed relationship present in Stanley and Caban which results ‘[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by “eom[ing] forward to participate in the rearing of his child.” ’ In this type of relationship, the putative father’s ‘interest in personal contact with his child receives substantial protection under the Due Process clause.’ The Court justified this distinction, stating:
“ ‘The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child’s future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child’s development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child’s best interests lie.’
“Because it adequately protected those classes of fathers who had a substantial relationship with their children, the Court held that the state statute did not violate due process.
“Like the lower courts, the Supreme Court emphasized that the right to receive notice of the adoption petition was in Lehr’s control because of the State’s enactment of a putative father registry. The Court did not consider as arbitrary the State Legislature’s concerns that ‘a more open-ended notice requirement would merely complicate the adoption process, threaten the privacy interests of unwed mothers, create the risk of unnecessary controversy, and impair the desire of finality of adoption decrees.’ Because of these concerns, the Court noted the State Legislature created a putative father registry to allow an unwed father to guarantee that, by mailing a postcard to the appropriate state agency, he would be entitled to receive notice of any adoption proceedings involving his child. The Court also ruled that a putative father’s failure to register due to his ignorance of the law did not constitute a sufficient reason for criticizing the law. Ultimately, it concluded that ‘[t]he Constitution does not require either a trial judge or litigant to give special notice to nonparties who are presumptively capable of asserting and protecting their own rights.’
“In its analysis of Lehr’s equal protection claim, the Court considered the State’s differential treatment of unwed mothers and unwed fathers. After finding that unwed fathers who had not established a relationship with their children were not similarly situated with mothers who had, it concluded that the *964 ‘Equal Protection Clause [did] not prevent [the] State from according the two parents different legal rights.’
“Taken together, these four unwed father cases suggest that while a biological relationship between a father and his child will not give rise to the father’s constitutional rights, the father may establish a constitutionally protected liberty interest by developing and maintaining a substantial relationship with his child. Unfortunately, these cases have left many important questions unanswered.
“C. Unanswered Questions
“Although the Supreme Court has offered a great deal of guidance in cases involving unwed fathers and older children, it has not decided any cases involving the adoption of newborns conceived out of wedlock. The Court refused to stay the state court proceedings in the case of Baby Jessica and refused to grant certiorari in the case of Baby Richard, thus suggesting that it is currently ‘unwilling to address the question of whether an unwed father has a legal interest in — and thus the right to veto the adoption of — a child he sired out of wedlock and with whom he has not yet had an opportunity to develop a relationship.’
“The matter of newborn adoption becomes even more complicated when the father is not only unwed, but unknown. Since the Court has not decided whether an attempt must be made to give notice of an adoption petition to an unwed father whose identity or whereabouts are unknown, states have had little guidance in developing statutory procedures to address this complex issue.”
Who’s Your Daddy? 32 Cap. U.L.Rev. at 115-27 (emphasis added; footnotes omitted).
Most states have now passed some form of a putative-father registry or registration of paternity, and in doing so these states, including both Alabama and Nebraska, have done all they can to protect the rights of putative fathers and the privacy interests of unwed birth mothers, prospective adoptive couples, and potential adoptees, in proceedings within the borders of each of those states.[8] In an increasingly mobile society, however, such state registries cannot, and do not pretend to, provide protection for the varied interstate interests that may arise in the possible scenario where a putative father may reside in one state, a birth mother in another state, conception occurred in a third state, the birth of the child took place in a fourth state, and the child was placed for adoption in potentially a fifth state. Should the birth mother change her residence after birth but before the child’s placement, a potential sixth state could be involved, as well as any lesser number of states, depending upon the particular facts. This makes it virtually impossible for a responsible putative *965 father who wants to avail himself of a proper registration to protect his potential rights to the child to be able to ascertain the proper forum state in which to do so. In fact, a putative father under such a hypothetical might well never know the identity of any of the states involved other than the state of his own residence.
The concept of a putative-father registry-may be burdensome to a putative father, but it cannot be contradicted that it gives him an opportunity to, and a procedure by which he can, perfect and propound that right, which he did not have before such registries.[9] A putative-father registry also protects the privacy rights of the unwed *966 birth mother by not forcing her to disclose the identity of the birth father against her wishes. The concept of a putative-father registry further protects the rights of the adoptive couple by giving them the confidence and assurance that the rights to notice and the issue of consents, whether express or implied, of all necessary parties has been judicially considered in the adoption forum and that there will never be a heartbreaking Baby Jessica or Baby Richard ending to their adoption. A putative-father registry advances the state’s interest in promoting “the welfare or best interests of the [adoptee], which include the encouragement of adoption in general and an expeditious and positive adoption specifically.” 2 C.J.S. Adoption of Persons § 4 (footnotes omitted). Finally, and certainly most importantly, a putative-father registry helps protect the best interests of the adoptee, especially an infant child, so that this child will either know and receive the love and benefit of his or her biological father, or the love and benefit of adoptive parents, but not have to undergo the emotionally wrenching experience of coming to know both through a change in custody occasioned by protracted litigation that only belatedly considered and protected the rights of the biological father.
There can never be a perfect procedure for giving notice to putative fathers in newborn adoptions. It is a biological and common-sense fact that the identity of the mother will always be known, but not so the biological father. Given the competing interests of the parties involved, there is only so much that government can do to search out putative fathers and give them notice of an adoption proceeding while protecting the privacy interests of the biological mother, who cannot be forced to disclose the identity of the putative father, and at the same time providing for an expeditious adoption proceeding. Various commentators have brought forth criticisms of putative-father registries on different grounds. Some believe that the establishment of putative-father registries as the sole vehicle for putative fathers to propound their rights does not go far enough, and that a mother should be encouraged to disclose the father’s identity so that more effective means of notice can be used. Analogies have been made that governmental programs exist that require mothers receiving public aid to cooperate in good faith in establishing paternity of their children. Jeffrey Parness, Adoption Notices to Genetic Fathers: No to Scarlet Letters, Yes to Good-Faith Cooperation, 36 Cumb. L.Rev. 68, 76-81 (2006). While this may be an effective economic incentive for birth mothers in need of financial aid, there would be no such economic motivation for the birth mother who is placing the child for adoption. Others note that it may be faulty to assume that “putative fathers know the registry exists and understand the requirements of proper registration,” Robbin Pott Gonzalez, The Rights of Putative Fathers to Their Infant Children in Contested Adoptions: Strengthening State Laws that Currently Deny Adequate Protection, 13 Mich. J. of Gender & Law 39, 49 (2006), and that “[f]ew states include publicity requirements in the registration statute.” Laurence C. Nolan, Preventing Fatherlessness Through Adoption While Protecting the Parental Rights of Unwed Fathers: How Effective Are Paternity Registries?, 4 Whittier J. Child & Family Advoc. 289, 321 (2005). These may be valid criticisms, but there must be a balancing of all competing interests when *967 considering the overriding concern — the best interests of the adoptee. Certainly, states can be encouraged to publicize these putative-father registries and to advise potential fathers of their rights under such registries. It must be remembered that the predicament being addressed was created when a potential father engaged in an extramarital sexual relationship that he knew could possibly lead to the conception of a child. The irresponsible putative father who has no interest in any child so conceived does not have to register and thus frees the child for adoption into a loving home. Should he belatedly decide that he wants to establish a relationship with the child, neither the child nor the adoptive parents have to worry about a subsequent traumatic interruption of their family unit. However, the responsible putative father who wants to establish and have the privilege of enjoying a father/child relationship has the ability to do so simply by perfecting his registration — a small price to pay for the preservation of his right to a parental relationship. Again, by putting the child’s best interests uppermost in the adoption process, a putative-father registry allows obstacles to the adoption to be quickly discovered so that if 'the adoption cannot be finalized, the litigation surrounding it will not drag on for years. A national putative-father registry would further protect against extended litigation caused by multijurisdictional disputes as is the case here.
A national putative-father registry would not be difficult either to conceive or to implement. It could be as simple as an amalgamation of the registries in all states, which would make putative-father registration accomplished anywhere available to any trial judge handling an adoption at the beginning of the proceeding, so that, as stated above, these issues can be discovered and litigated quickly. The potential implementation of such a registry has been well stated to be as uncomplicated as the following:
“Congress should enact a national putative father registry database to 'address the interstate effect of adoptions. The system would have the dual purposes of facilitating notice of adoption proceedings to unmarried birth fathers in interstate adoptive situations and of promoting secure adoptive placements. The state putative father registries should file with the national putative father registry database for every man who files with the State. Each State should maintain its own statutory adoption scheme including regulation of the parental rights and responsibilities of unwed fathers. The national link should provide a means for the registered unwed father to obtain notice of the need to protect his parental rights in any of the participating states despite the interstate travel of the mother....
“ .<.. State laws should require attorneys, state agencies, and/or adoption agencies in a planned or pending adoption to search the nationally linked putative father registry before final disposition of the adoption proceedings.”
Beck, 25 Harv. J.L. & Pub. Pol’y at 1038 (footnotes omitted).
With regard to the constitutional authority of Congress to enact federal legislation providing for a national putative-father registry and the ability of Congress to encourage state participation in a national registry, the above article goes on to state:
“Congress is the appropriate legislative body for putative father registry legislation because adoption has a federal aspect, in that a woman may conceive a child in one State, reside in a second State, give birth in a third State, and relinquish for adoption in a fourth State. It is in this situation, where the biologi *968 cal mother, biological father, the adoptive parent(s), and the child have connections to two or more States, that the individual state putative father registries can neither protect the rights of putative fathers nor advance the interests of children. Only federal legislation providing a national database, linking all participating state registries, can effectively address this family-law problem, even though family law, including adoption, is traditionally reserved to the States. This precise rationale underlies other federal statutes, including most notably the Child Support Recovery Act.
“Congress may enact a federal putative father registry database under the commerce power. Adoption is not traditionally considered commerce because nothing is bought or sold. Interstate adoption substantially affects interstate commerce, however, because of the aggregate transaction costs involved. Adoptive parents may incur large legal debts, ranging between zero and $30,000, across at least two States. Part of that debt derives from the interstate nature of the adoption, which necessarily involves interstate travel. These burdens, plus an increased likelihood of litigation resulting from incompatible and unconnected state registries, increase the expense incurred in interstate commerce. A federal registry statute, therefore, will regulate an area ‘substantially affect[ing] interstate commerce.’ The commerce power, then, will allow Congress to erect and operate a national putative father registry database.
“A secure authority for securing state participation, and providing funding to States, is the spending power. The Supreme Court has adopted the view that Congress has broad authority to tax and spend for the general welfare. A nationally linked putative father database would both advance children’s rights to stable and permanent homes and protect the liberty interest unmarried fathers have in developing relationships with their children. These two benefits demonstrate that a national registry database would serve the general welfare of the nation.
“The Supreme Court has explained that Congress may permissibly set conditions for the receipt of federal funds even as to areas that Congress might otherwise not be able to regulate. Such an arrangement is particularly applicable to a congressional grant of funds to the States for family law purposes, i.e., the erection of state registries compatible with a national database. Specifically, the Court wrote, ‘[w]hile the United States is not concerned with, and has no power to regulate, local political activities as such of state officials, it does have power to fix the terms upon which its money allotments to States shall be disbursed.’ The Court continued this reasoning in South Dakota v. Dole, [483 U.S. 203 (1987),] where Congress sought to create a minimum drinking age by withholding a portion of federal highway funds from States that failed to impose such a minimum drinking age. The Court permitted this conditioning of federal funds, because it served the general welfare by providing for safer interstate travel and it could be characterized as a permissible economic inducement as opposed to coercion. Congress may therefore provide money to States to erect state-level putative father registries and condition this and other federal monies on compliance with national putative father registry guidelines.
“In summary, the rationale for such federal intervention into family law, which is traditionally reserved to the States, are the facts that individual States cannot effectively address the *969 problems typically associated with contested interstate adoptions and that only a federally established nationally linked putative father database can solve the problems. A national database may be erected by Congress under the commerce power, and state funding and cooperation may be secured through the spending power.”
Beck, 25 Harv. J.L. & Pub. Pol’y at 1073-75.
As in the cases of Baby Richard and Baby Jessica, and similar adoption proceedings that have gone awry and that have lasted far too long, there can be no happy ending for everyone concerned here. Depending upon the ultimate result reached in this matter by the appropriate forum, either a father will have lost his rights to his biological child, or the lives of D.B. and T.B., the adoptive parents, will be forever devastated. And what of the child? He will either have lost his opportunity to know and love his biological.father, or he will be pulled away screaming and crying, both physically and emotionally, nearly four years of age, from the arms of an adoptive mother and an adoptive father who have loved, held, and protected him almost since birth. Children such as Baby Richard, Baby Jessica, and now possibly this child do not make the laws that put them at risk; rather, shame on the adult lawmakers who have failed to enact legislation that would prevent another tragic adoption result. I call upon Congress to stop this madness — stop this madness before another father, another child, and another adoptive family endure this inconceivable and inconsolable heartache.
STUART and SMITH, JJ., concur.

. Interest of B.G.C., 496 N.W.2d 239 (Iowa 1992); In re Baby Girl Clausen, 442 Mich, 648, 502 N.W.2d 649 (1993).

. In re Petition of Kirchner, 164 Ill.2d 468, 208 Ill.Dec. 268, 649 N.E.2d 324 (1995).

. Ala.Code 1975, § 26-10C-1; Ariz.Rev.Stat. § 8-106.01; Ark.Code Ann. § 20-18-701 et seq.; Colo.Rev.Stat. § 19-4-105; Conn. Gen. Stat. §§ 45a-716 and 46b-172a; 13 Del.Code § 8-401 et seq.; Fla. Stat. § 63.054; Ga.Code Ann. § 19-11-9; Haw.Rev.Stat. § 578-2(d)(5); Idaho Code § 16-1513; 750 Ill. Comp. Stat. 50/12.1; Ind.Code § 31-19-5-2 et seq.; Iowa Code § 144.12A; La.Rev.Stat. 9:400; Mass. Gen. Laws ch. 210, § 4A; Mich. Comp. Laws § 710.33; Minn.Stat. § 259.52; Mo.Rev.Stat. § 192.016; Mont.Code Ann. § 42-2-201 et seq.; Neb.Rev.Stat. § 43-104.01 (2007 Neb. Laws L.B. 296); N.H.Rev. Stat. Ann. § 170-B:5; N.M. Stat. Ann. § 32A-5-20; N.Y. Soc. Servs. Law § 372-c; Ohio Rev.Code Ann. § 3107.061 et seq.; Okla. Stat. tit. 10, § 7506-1.1; Or.Rev.Stat. § 109.096(3); 23 Pa. Cons.Stat. § 5103; Tenn.Code Ann. § 36-2-318; Tex. Fam.Code Ann. (Vernon) § 160.401; Utah Code Ann. § 78-30-4.13 (2007 Utah Laws Ch. 196 HB.51); Va.Code Ann. § 63.2-1249 et seq. (eff. July 1, 2007); Vt. Stat. Ann. tit. 15, § 307; Wis. Stat. § 48.025; and Wyo. Stat. Ann. § 1-22-117.

. In M.V.S. v. V.M.D., 776 So.2d 142, 149-51 (Ala.Civ.App.1999), the Court of Civil Appeals stated:
"The legislature apparently concluded that a man concerned that he has impregnated a woman, and who is interested in taking responsibility for his offspring, should take affirmative action by filing with the registry. The effort required for filing with the registry is minimal. In fact, the legislature mandated that the Department of Human Resources create a form to ease the filing requirements. See § 26-10C-1(g). The Supreme Court noted in Lehr that the unwed father's right to notice of adoption proceedings was within his control because ‘by mailing a postcard to the putative father registry, he could have guaranteed that he would receive notice of any proceedings to adopt [the child].' 463 U.S. at 264, 103 S.Ct 2985. The Supreme Court in Lehr ruled that due process for unwed fathers requires that state law provide an adequate opportunity for them to claim paternity and to take responsibility for their children in a timely manner. Lehr recognized that limits on procedural protection for a putative father are necessary from the prospective of the child, who needs a stable start in life and needs stability early.
[[Image here]]
"There are compelling reasons for the legislature's providing a specified period within which to assert parental rights as an unwed father. If adoption were precluded until a putative father acted to assert his rights, then protracted litigation would undoubtedly ensue. Take the widely publicized cases of In re Baby Girl Clausen, 442 Mich. 648, 502 N.W.2d 649 (1993), and In re Kirchner, 164 Ill.2d 468, 208 Ill.Dec. 268, 649 N.E.2d 324 (1995), cert. denied, 515 U.S. 1152, 115 S.Ct. 2599, 132 L.Ed.2d 846 (1995), better known as the 'Baby Jessica’ and ‘Baby Richard' cases. In both cases, the biological mothers placed children for adoption. After finding out about the adoptions, both biological fathers claimed that they had not properly given their consent to the adoptions. Both cases were litigated for years and were eventually resolved in favor of the biological fathers. The children (ages two and four) were taken from the only homes they had ever known in order to protect the rights of their biological fathers. A law such as the Putative Father Registry Act would have prevented such an adoption fiasco.
"An unwed father, by merely registering under the Act, obtains a right to notice and an opportunity to be heard. In discussing Illinois’s Putative Father Registry Act, which was adopted in response to the Baby Richard case, one writer has noted, with regard to the burden placed on the unwed father:
" 'The burden placed on putative fathers under Illinois’s new legislation is not necessarily out of step with modern mores or the realities of contemporary heterosexual relationships. Neither is it completely unrealistic. To meet the burden which the new legislation places on a putative father, he need neither remain in contact with a woman with whom he has had sexual intercourse, nor turn to other sources of information to determine whether he has conceived a child with her. Under the new legislation, a putative father need only file with the putative father registry based on his knowledge that he has had intercourse with a woman and commence a parentage action within thirty days of that filing. His interests will not be jeopardized if he ends relations with her, and his social habits .are not, therefore, greatly affected. By simply mailing a postcard to the registry and commencing a parentage action, tasks which can hardly be labeled a burden, a putative father can preserve his rights to notice and consent.’
“Mahrukh S. Hussaini, Incorporating Thwarted Putative Fathers into the Adoption *966 Scheme: Illinois Proposes a Solution After the ‘Baby Richard’ Case, 1996 U. Ill. L.Rev. 189, 220 (1996).”